## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| JAZME, LLC, *a Minnesota limited liability company*, *d/b/a* ALLIANCE STEEL SERVICE, | Civil No. 10-1196 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| WENDT CORPORATION, *a New York corporation*, | |
| Defendant. | |

Aaron A. Myers and Laura N. Maupin, **BARNES & THORNBURG LLP**, 100 South Fifth Street, Suite 1100, Minneapolis, MN 55402, for plaintiff.

Gregory A. Bromen and Stanley E. Siegel, Jr., **NILAN JOHNSON LEWIS PA**, 120 South Sixth Street, Suite 400, Minneapolis, MN 55402; Brian D. Gwitt and Taylor M. Miranda, **DAMON MOREY LLP**, 200 Delaware Avenue, Suite 1200, Buffalo, NY 14202, for defendant.

Plaintiff JAZME, LLC ("Jazme") brought this suit against Wendt Corporation ("Wendt") alleging breach of contract, breach of express warranties, unjust enrichment, and fraudulent inducement, arising out of a contract for the sale of metal recovery equipment. Because ambiguity exists as to certain terms in the contract, the Court denies Wendt's motion for summary judgment as to the breach of contract and breach of express warranties claims. However, because the contract explicitly disclaims extra-contractual

representations regarding the equipment's performance, the Court denies summary judgment as to the unjust enrichment and fraudulent inducement claims.

## BACKGROUND

### I.    PARTIES

Jazme is a Minnesota limited liability corporation with its principal place of business in Minneapolis, Minnesota.  Jazme processes scrap metal for resale.  Bayside Recycling ("Bayside") is a Duluth company with the same ownership as Jazme and run as a part of Jazme.  Bayside's operations involve the shredding of automobiles to reclaim metals.  Jazme purchases a portion of its scrap metal needs from Bayside.  (Michael Zweigbaum Dep. at 10:2-12:23, Dec. 15, 2010, Myers Decl., Mar. 21, 2011, Ex. 4, Docket No. 47.)  Michael Zweigbaum is an owner of both Jazme and Bayside.  (*Id.* at 10:9-11:6.)

Wendt is a New York corporation with its principal place of business in New York.  Wendt designs, engineers, and installs metal recovery systems.  (Tom Wendt Dep. at 14:9-18, Jan. 21, 2011, Myers Decl. Ex. 5.)

### II.    JAZME'S OPERATIONS

At Bayside, automobile hulks are loaded into a feeder which shreds them.  The output from Bayside's shredder operation is three distinct products: (1) ferrous (magnetic) material; (2) residue, which includes non-metallic waste and the non-ferrous (i.e. non-magnetic) metals such as aluminum, copper, and stainless steel; and (3) fluff, which is primarily composed of lighter, non-metallic materials (e.g. seat covers,

dashboards, etc.), that are separated by an air-separator.  (Christopher J. Goodwald Dep. at 18:13-19:22, 35:21-38:16, Mar. 21, 2011, Myers Decl. Ex. 6.)  Approximately seventy percent of the automobile shredder output is ferrous material which is saleable. (Goodwald Dep. at 37:4-9.)  The other thirty percent of the shredder output is divided into the residue and fluff piles.  (Goodwald Dep. at 38:9-16.)  Approximately five percent of the fluff is metal, although the percentage varies, whereas the residue is at least forty percent metal but can be a significantly higher percentage, including more than sixty percent metal.  (Zweigbaum Dep. at 16:15-17:25.)

Prior to purchasing the Wendt equipment, Bayside sold its residue without further processing, and the fluff material was sent to a landfill.  (Zweigbaum Dep. at 19:6-10.) Extracting metals from the residue can produce a cleaner metallic material, referred to as "ZORBA" within the industry, which commands a higher price.   Wendt's proposed expert on nonferrous recovery, Daniel Shapiro, testified that Jazme could sell its residue "as is" for an estimated forty cents per pound, but could sell the cleaner ZORBA for eighty cents per pound.  (Daniel J. Shapiro Dep. at 69:24-70:9, Jan. 27, 2011, Myers Decl. Ex. 8.)  Because the fluff contains metals, Jazme sought to remove the metals from the fluff, both to reduce landfill costs and to increase revenues, as the recovered metals can be sold for profit.  (Zweigbaum Dep. at 191:2-24, Gwitt Aff. Ex. D, Docket No. 30.)

To improve the salability of its residue and/or fluff, Jazme sought equipment known as an "eddy current."  (Zweigbaum Dep. at 22:5-23:13.)  Zweigbaum stated that the reason for acquiring an eddy current system was to improve the recovery in their auto shredder residue, which did **not** include fluff.  (*Id.* ("Q: When you say 'auto shredder

residue,' are you including fluff within that?  A: I am not.  Q: You are just referring to the residue?  A: Fluff is fluff.  Residue is residue.").)

Wendt and Jazme were initially introduced at an industry trade show in 2007, when Thomas Rogers, an owner of Jazme, spoke with Mark Ridall, a Wendt Sales representative.  (Mark Ridall Dep. at 47:2-51:9, Jan. 20, 2011, Myers Decl. Ex. 9.) Later, Ridall visited Bayside's plant and viewed its shredding operations, including the fluff and residue being generated.  (Ridall Dep. at 53.)  Ridall stated that he recalls that Jazme wanted to recover metals from the fluff to increase revenue and reduce landfill costs.  (Ridall Decl. ¶ 8, Feb. 28, 2011, Docket No. 27.)  However Zweigbaum states that Jazme was interested in processing the residue and the fluff, as opposed to only the fluff. (Zweigbaum Dep. at 26:19-27:3.)  At the time of the tour, Ridall observed, and Jazme advised Ridall, that the metal content of the fluff material produced at Bayside was approximately five to six percent metal.  (Ridall Decl. ¶ 13; Steve Kenigsberg Dep. at 50:18-20, Dec. 14, 2010, Gwitt Decl. Ex. C.)  Jazme also allegedly communicated to Wendt that it was interested in purchasing a system that would accommodate the growth plans for the company, including the processing of significant extra tonnages at Bayside. (Kenigsberg Dep. at 38:21-39:5, Myers Decl. Ex. 7.)

After the meeting, Ridall sent Jazme an email with a Return on Investment tool attached, that was allegedly solely based on the value of recovering metals from fluff. (*Id.* at 49:17-50:24, Gwitt Decl. Ex. C.)  In spring 2007, William Close, Wendt's sales engineer, visited Bayside to discuss designing a nonferrous materials recovery system. (William Close Dep. at 23:8-13, Jan. 19, 2011, Myers Decl. Ex. 10.)  Wendt alleges that

the purpose of the meeting was to explain to Jazme how the Wendt equipment operates. Close testified that the parties never discussed processing any material other than the fluff.  (William Close Decl. ¶ 5, Feb. 28, 2011, Docket No. 26.)  Bruce Foley, controller at Bayside, stated in an email that the "[r]ecovery of the metal which we were told is in our fluff is key to the cost justification of this process." (Kenigsberg Dep. at 134:6-24.)

Wendt told Jazme that it should add another machine, known as a "finder" to capture stainless steel.[1]  Wendt said that such a system would capture the additional material and allegedly still allow Bayside to process both its fluff and residue. (Zweigbaum Dep. at 32:16-33:10.)   Shortly after the meeting, Close sent Jazme a document (the "How it Works" document) allegedly memorializing the discussions with Jazme.  Close states that he sent this document so that all parties would be on the same page as to the purpose of the equipment.  (Close Decl. ¶ 7.)

## III.    CONTRACT BETWEEN JAZME AND WENDT

On July 9, 2007, Wendt and Jazme entered into a contract (the "Contract") for the purchase of equipment from Wendt for $1,045,808.  (Ridall Decl. Ex. D.)  Wendt also informed Jazme that it would need to construct a new building at Bayside specifically engineered to house the equipment.  Jazme paid $1,100,000 in construction costs for a new building, designed with Wendt's input, to house the nonferrous recovery system. (Zweigbaum Dep. at 200:18-19.)

---

[1] A "finder" uses sensors to identify stainless steel, then a jet of compressed air separates the stainless steel from the rest of the materials going over the sensor.  An eddy current uses a "rare earth magnet" to identify and separate nonferrous materials, and will not catch stainless steel as effectively as a finder.  (Shapiro Dep. at 41:12-43:22.)

The Contract contains several parts, including what Jazme describes as the "legal" portion, and the "How it Works" document. The "legal portion" contains several clauses around which this litigation centers. First, under the heading **WENDT CORPORATION TERMS AND CONDITIONS OF SALE**, the Contract includes the following language:

> Order Acceptance by WENDT CORPORATION: Entire Agreement. A proposal by WENDT CORPORATION (WENDT) is not an offer, and requires WENDT's acceptance. Upon WENDT'S acceptance of a proposal, these terms and conditions will constitute ("the Agreement") between WENDT and Buyer. WENDT specifically rejects any conflicting or additional terms contained in any PO or other document submitted by Buyer unless expressly agreed to in writing.

(Gwitt Decl. Ex. D at AS001155 ¶ 1.) Under the heading **WENDT CORPORATION LIMITED NEW EQUIPMENT WARRANTY**, the Contract states:

> In the event of the failure of the Equipment to comply with the Warranty . . . in material or workmanship . . . then Purchaser's sole and exclusive remedy and Wendt Corporation's sole obligation shall be that Wendt Corporation shall, at its sole cost and expense, correct all such defects in material and/or workmanship . . . .

(*Id.* at AS001156 ¶ I(b).) Further, the contract states:

> (1) WENDT CORPORATION MAKES NO OTHER REPRESENTATION, WARRANTY OR GUARANTEE OF ANY KIND TO PURCHASER, OR ANY THIRD PARTY, EXPRESS OR IMPLIED . . . ORAL OR WRITTEN, DIRECT OR INDIRECT, INCLUDING WITHOUT LIMITATION, ANY REPRESENTATION, WARRANTY OR GUARANTEE OF MERCHANTABIITY OR FITNESS FOR AN ORDINARY, GENERAL, OR PARTICULAR PURPOSE, WITH RESPECT TO THE EQUIPMENT . . . OR AS TO ANY MATTER WHATSOEVER WITH RESPECT TO THE EQUIPMENT OR ITS PERFORMANCE, INCLUDING WITHOUT LIMITATION, ITS CONDITION OR PERFORMANCE CAPABILITIES OR THE QUALITIES OF ANY GOOD OR SERVICE PRODUCED THEREFROM . . . (2) **WENDT CORPORATION EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, ANY STATEMENTS MADE BY WENDT CORPORATION, ITS**

**EMPLOYEES OR AGENTS**, . . . DO NOT CONSTITUTE WENDT CORPORATION REPRESENTATIONS OR WARRANTIES, SHALL NOT BE RELIED UPON BY PURCHASER OR ANY THIRD PARTY AND ARE NOT A PART OF THIS WARRANTY.

(*Id.* at AS001156 ¶ I(g) (emphasis added).)

According to the "How it Works" portion of the Contract, one goal of the Wendt equipment is to create a ZORBA-quality product of eighty-five to ninety-five percent metal quality.  (Ridall Decl. Ex. D at AS001145.)  It states:

> GOAL:  Recover <u>all types of metals including stainless steel</u> from Automobile Shredder Residue (ASR) stream.
>
> INPUT: The system is designed for a maximum continuous flow of 15TPH [tons per hour] ASR.  Presently you are generating approximately 7TPH ASR flow . . .
>
> RECOMMENDATION:
>
>> <u>STEP 1</u>: We are recommending a Finder as your primary recovery tool.  A Finder is a machine used for recovering metals from trash streams . . . This machine will produce a landfill ready trash stream with less than 1% metal content . . . .  The output from step 1 will be a metals concentrate that is 40-50% metal concentrate.
>>
>> <u>STEP 2</u>: We are recommending an Eddy Current Separator (ECS) as your secondary recovery tool . . . .  It is our intention to tune this machine to produce a high quality ZORBA product in the 85-95% metals concentrate range.

(*Id.* at AS001144-45.)

Tom Wendt, President of Wendt, testified that "residue" means "a byproduct of making clean ferrous shred from scrapped automobiles and miscellaneous light iron." (Wendt Dep. at 20:1-4.)  Close, who designed the system for Jazme, testified that "Auto Shredder Residue" (ASR) would be the "nonferrous portion of the materials.  Basically, anything that does not stick to a magnet.  Ferrous would stick to a magnet."  (Close Dep.

at 20:9-12.)   Close also testified that to him, the term "fluff" meant "auto shredder residue, but here we've had air classification, so it would be the low metal percentage material." (*Id.* at 20:16-18.)   The Contract had a structured "stop point" whereby Jazme could choose to approve or cancel the order of equipment from Wendt.  (Ridall Decl. Ex. D at AS001140 ("$235,000 Non-Refundable Equipment Deposit due with signed approval drawings, Customer can cancel or approve the project without further obligation.").)

Wendt installed the finder and the eddy current machine at Bayside in May 2008. After the equipment was "commissioned" (i.e. started and calibrated), Jazme informed Wendt, allegedly for the first time though this fact is strongly disputed, that it intended to process an additional material known as "aluminum breakage," which has an eighty-five to ninety-five percent metal content.  (Ridall Decl. ¶ 10.)  Jazme alleges that the system it purchased from Wendt did not function as promised.  Specifically, Jazme complains that it invested in a nonferrous recovery system to process the materials being generated from its shredding operations, and that if, as occurred here, the shredding operations generates a greater volume of metal overall than what the system can process, the system is not as valuable an investment as intended.  (Shapiro Dep. at 39:22-40-3.)   Jazme claims the Wendt system is incapable of processing the residue product at its desired efficiency.

The system installed at Jazme is not designed to process residue product, but is suited to processing fluff, at 15 tons per hour ("TPH").  (Shapiro at 83:24-84:6.)  With a metallic percentage of feedstock of forty percent or higher, a system designed with a finder placed before the eddy current machine will not effectively process the feedstock.

(Shapiro Dep. at 58:20-59:8 ("Q: Is it also a case that at a 40 to 50 percent feed stock, that that metal percentage is going to overwhelm the finder?  A: Absolutely.  It will overwhelm the finder because there's – because it's going to be firing constantly.  It's not going to have the ability to discern the waste stream coming across or the stream of product coming across it . . . . That's why the eddy [current machine] is a more efficient means of separating that stream than a finder.").)  Close, the designer of the system, testified that a design with the eddy current in the first position, before the finder, would be the appropriate system design for applications "where the metal content is significantly above five percent."  (Close Dep. at 35:3-6.)  Close also testified that "[t]he plant as it was designed for landfill material, the processing goal was to quickly reduce volume by using the finder as the primary recovery tool."  (*Id.* at 32:10-16.)

Shapiro also testified that even if Jazme altered its ASR content by aggregating the fluff and residue material into a feedstock with twelve to fifteen percent metal content – what he considers a more typical composition for ASR – the system still could not process 15TPH as described under the contract.  (Shapiro Dep. at 82:18-25.)  However, Shapiro did testify that as currently configured, the system can process the **fluff** at 15TPH.  (Shapiro Dep. at 82:15-17.)

Jazme asserts that it put Wendt "on notice" that the system was not operating according to its expectations in June and August 2008 when it sent emails to Close and Ridall expressing disappointment that the equipment was not processing fluff or residue as Jazme expected.  (Myer Aff. Exs. 13-14.)  After being notified, Tom Wendt visited Bayside, where he viewed the composition of Bayside's residue and acknowledged that

he would have done things differently based on the composition of the residue, and that there was "clearly a disconnect between what you bought and what was sold to you." (Wendt Dep. at 34:4-6.)

In an email to Ridall on June 26, 2007, Zweigbaum asked: "Is it our intention to run our fluff as well as our residue through the medial separation plant or just the residue, which will contain more fluff than usual as the air system on the shredder will be turned down significantly?" (Myers Decl. Ex. 2.) Ridall responded: "Which material we choose to run is completely up to you – you have the choice. The equipment can handle either choice. For maximum recovery you should run both as both will contain metal." (*Id.*) This email exchange occurred before the "stop point" at which both companies could have walked away from the deal if the system was not going to function as Jazme anticipated. (Wendt Dep. at 43:9-13 ("Q: We're still at before the stop point where the companies can walk away . . . . right? A: Yes.").)

Wendt notes that Jazme has not stopped using the equipment it purchased, and operates it on a daily basis, up to approximately thirty-six to thirty-eight and a half hours per week. (Kenigsberg Dep. at155:8-15.) Wendt brought this motion for summary judgment, arguing that the disclaimers in the Contract, mandate summary judgment on all of Jazme's claims.

## ANALYSIS

## I.        STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[2]

## II.       PAROL EVIDENCE

Wendt argues that Jazme's efforts to add terms to the Contract regarding the performance capabilities of the equipment are barred by the parol evidence rule because the Contract is fully integrated.  "A contract which appears complete on its face is an integrated agreement as a matter of law."  *Battery Steamship Corp v. Refineria Panama, S.A.*, 513 F.2d 735, 738 n.3 (2d Cir. 1975) (citing *Higgs v. De Maziroff*, 189 N.E. 555 (N.Y. 1934)).  In the absence of a clause explicitly stating that the agreement is integrated, "the court must determine whether or not there is an integration by reading the

---

[2] The parties agreed that the Contract would be governed by and construed in accordance with New York state law.  (Riddall Decl. Ex. D at AS001155 ¶ 17.)  Minnesota courts honor choice-of-law provisions in contracts, *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997), thus New York law applies.

writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing." *W. Intermodal Servs., Ltd. v. Singamas Container Indus. Co.*, No. 98-CIV-8275, 2000 WL 343780, at *2 (S.D.N.Y. Mar. 31, 2000) (quotation marks omitted). Section 2-201 of the Uniform Commercial Code ("UCC") provides that the formal requirements of a contract are a record describing the quantities purchased, signed by the party against whom it is to be enforced.

Courts generally have found that when a contract "contains the parties' names and addresses, the date of execution, a description of the goods, and payment and price terms, . . . makes no mention of an oral agreement, and the alleged oral agreement concerns terms that parties normally would reduce to writing[,]" then that contract is a fully integrated document. *W. Intermodal Servs., Ltd.*, 2000 WL 343780, at *2 (internal citations omitted); *see also Sky Acres Aviation Servs., Inc. v. Styles Aviation, Inc.*, 620 N.Y.S.2d 442, 443 (N.Y. App. Div. 1994). The Contract's "merger clause" provides in part that:

> Upon WENDT'S acceptance of a proposal, these terms and conditions will constitute ("the Agreement") between WENDT and Buyer. WENDT specifically rejects any conflicting or additional terms contained in any PO or other document submitted by Buyer unless expressly agreed to in writing.

(Gwitt Decl. Ex. D at AS001155 ¶ 1.)  Because the Contract includes all of the terms required by the UCC, as well as additional information regarding the specifics of the Contract and a merger clause, the Court finds the Contract to be a fully integrated agreement.

The parol evidence rule bars proof of any oral terms to a contract where the contract is complete and exclusive.  N.Y. U.C.C. § 2-202 ("Terms . . . which are . . . set forth in a record intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement . . . .").  Where a contract is integrated and contains a disclaimer of outside representations, the parol evidence rule operates as a bar to proof of oral warranties not included in the writing.  *See W. Intermodal Servs., Ltd.*, 2000 WL 343780, at *2 (disclaimer of "all express and implied warranties as to the design or condition of . . . equipment . . . [bars] evidence related to the alleged oral agreement . . . ." (internal quotation marks and citations omitted)).  Further, "[i]f the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact."  N.Y. U.C.C. § 2-202 cmt. 3.

The Contract provides:

WENDT CORPORATION MAKES NO OTHER REPRESENTATION, WARRANTY OR GUARANTEE OF ANY KIND TO PURCHASER, OR ANY THIRD PARTY, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, ORAL OR WRITTEN . . . (2) **WENDT CORPORATION EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, ANY STATEMENTS MADE BY WENDT CORPORATION, ITS EMPLOYEES OR AGENTS**, . . . DO NOT CONSTITUTE WENDT CORPORATION REPRESENTATIONS OR WARRANTIES, SHALL NOT BE RELIED UPON BY PURCHASER OR ANY THIRD PARTY AND ARE NOT A PART OF THIS WARRANTY.

(*Id.* at AS001156 ¶ I(g) (emphasis added).)

- 13 -

Jazme would like the Court to consider alleged oral and emailed representations made by Ridall and Wendt to modify the language of the contract.  As the Court has already found that the Contract is a fully integrated agreement, and the additional performance representations Jazme would like added to the Contract are precisely the type of terms that would certainly have been (and arguably were) included in the document, the parol evidence rule applies to bar the addition of terms to the Contract.

Jazme also argues that terms in the Contract are ambiguous, and therefore the bar on extrinsic evidence should not apply, and evidence of statements made by Wendt representatives should be admissible to resolve ambiguities in the Contract.  When a contract is ambiguous, its interpretation becomes a question of fact and summary judgment is inappropriate.  *Rogath v. Siebenmann*, 129 F.3d 261, 267 (2d Cir. 1997).  A contractual term is ambiguous when it may be ascribed "conflicting reasonable interpretations."  *Id.*  "[E]ven where there is an 'integrated' contract, extrinsic evidence [is] admissible to resolve an ambiguity or equivocation."  *Allstate Ins. Co. v. White Metal Rolling & Stamping Corp.*, 466 F. Supp. 419, 421 (E.D.N.Y. 1979) (citing *Concoff v. Occidental Life Ins. Co. of Cal.*, 152 N.E.2d 85, 88 (N.Y. 1958)).

The main source of ambiguity in this case stems from the definition of "automobile shred residue" and whether that term means fluff, residue, or a combination of the two.  For instance, Shapiro testified that ASR can refer to many types of feedstock:

> A:   [T]here is no absolute standard for what we're talking about [the amount of nonferrous material in the Wendt system].   And companies develop their own terminology.  The Institute has not clarified it in terms of what we're talking about . . . .  But if we feed X into a shredder, Y would be the ferrous fraction.  Z would be

everything else . . . .   Everything else is called automobile or after
shredder residue.   And when the metals are pulled out of it . . . the
material that is sent to the landfill it may be called ASR, as well, or
fluff.

Q:     So ASR might be landfill too?

A:     Yes.

(Shapiro Dep. at 64:4-20.)  By comparison, Zweigbaum testified that he understood ASR
to mean residue, and fluff to mean fluff.  (Zweigbaum Dep. at 22:5-23:13.)  The varying
definitions of "fluff" and "ASR" provided by the parties and their experts suggest an
ambiguity in the Contract that impacted each party's performance expectations.   Thus,
the Court finds  that a genuine issue of material fact exists as to what the obligations of
the Contract were, and whether Wendt met them.  While the Contract is wholly integrated
and parol evidence cannot be admitted to vary the terms of the Contract, extra-contractual
representations can be used to clarify ambiguities inherent in the language of the
Contract.   *See* N.Y. U.C.C. § 2-202; *Allstate*, 466 F. Supp. at 421

## III.   JAZME'S CLAIMS

Jazme's complaint contains four claims: (1) breach of contract design; (2) breach
of express warranty claims; (3) unjust enrichment; and (4) fraudulent inducement.  Wendt
has moved for summary judgment on each claim.  (Docket No 25.)

### A.     Breach of Contract-Design

Wendt first argues that, while styled as a breach of contract claim, Count One of
the Amended Complaint is actually a claim for a breach of the implied warranty of fitness
for a particular purpose.  (Am. Compl. ¶ 28 ("Wendt[] fail[ed] to design a machine that

met the specific and reasonable expectations set forth by Alliance Steel/Bay Side . . . .").)

The UCC defines the implied warranty of fitness for a particular purpose as follows:

> Where the seller at the time of contracting has reason to know any
> particular purpose for which the goods are required and that the buyer is
> relying on the seller's skill or judgment to select or furnish suitable goods,
> there is **unless excluded or modified** under the next section an implied
> warranty that the goods shall be fit for such purpose.

N.Y. U.C.C. § 2-315 (emphasis added).  The implied warranty of merchantability can be

excluded or modified if the Contract "mention[s] merchantability and in case of a writing

[is] conspicuous, and to exclude or modify any implied warranty of fitness the exclusion

must be by a writing and conspicuous."  N.Y. U.C.C. § 2-316(2).  Wendt argues that

Jazme's complaints that the equipment was obligated to process residue – and at a higher

rate than it presently does – amounts to a challenge to the fitness for a particular purpose

instead of a breach of the contract, and that the Contract properly excludes such a

challenge.  (*See* Myers Decl. Ex. 1 at AS001156 ¶ I(g).)

However, Wendt has cited no law, and the Court is not independently aware of

any, that would allow Jazme's breach of contract claim to be dismissed by

recharacterizing it as a breach of the implied warranty of fitness claim.  Jazme's claim is

that Wendt promised to provide a system that would process residue at a particular rate

and failed to do so.  Thus, the claim is properly for breach of contract, and the Court will

not construe it as a claim for breach of implied warranty.  *See Word Mgmt. Corp. v.*

*AT&T Information Systems, Inc.*, 525 N.Y.S.2d 433, 435 (N.Y. App. Div. 1988) (finding

that a breach of contract action survived summary judgment even where the implied

warranty of fitness for a particular purpose was conspicuously disclaimed).  As such, the Court denies summary judgment as to Count One.

### B.      Breach of Express Warranty

Wendt argues it has not breached any express warranty in the Contract.  The complaint identifies three representations in the Contract as the basis for a breach of express warranty: (1) the finder/eddy current system would process materials at a maximum rate of 15TPH; (2) the recovery system would process fluff; and (3) the recovery system would recover non-ferrous metal with an eighty-five to ninety-five percent metal concentrate.  (Am. Compl. ¶ 31; Myers Decl. Ex. 1 at AS001144-45.) Jazme alleges that Wendt also orally represented that the recovery system would operate at a "one-to-one" speed ratio with Bayside's shredder.  (Am. Compl. ¶ 31.)

Wendt states that the "maximum rate" complaint is a mischaracterization of the Contract, because the "How it Works" document does not state that the equipment would process the materials at 15TPH, it instead states that the maximum **input** stream of residue is 15TPH.  (Myers Decl. Ex. 1 at AS001144 ("The system is designed for a maximum continuous flow of 15TPH ASR.").)  Though the paragraph Wendt refers to is labeled "Inputs," a reasonable juror could understand it to mean either that Jazme **produces** 15TPH ASR which it desires to run through the machine, or that the equipment can **process** 15TPH ASR.  As highlighted above, there is also an ambiguity as to what each party believed "ASR" to mean.  Wendt would like it to be interpreted as only fluff,

whereas Jazme believed it to be residue as well as fluff.  As such, material factual issues remain precluding summary judgment on this basis.

Wendt next alleges that Jazme is misusing the equipment, by processing its sixty-two percent metal content residue instead of the below-five percent metal content fluff that Wendt argues was anticipated by the Contract.  The Contract represents that the output from the finder would be approximately forty to fifty percent metal concentrate. Jazme's residue material is approximately sixty-two percent metal content, prior to any nonferrous processing.  Thus, Wendt argues it is nonsensical to read the Contract to require the finder to produce output of forty to fifty percent metal content, when the finder's purpose is to **increase** the metal content and the residue is already sixty-two percent metal content.  (Myers Decl. Ex. 1 at AS001144; Kenigsberg Dep. at 18:18-20, 142:3-23.)  Finally, Wendt notes that Zweigbaum testified that the Wendt equipment produces a non-ferrous product of approximately ninety-two percent metals concentrate, a rate which exceeds the "85-90% metal concentrate" promised in the contract." (Zweigbaum Dep. at 206:18-21.)  Though there appears to be no question that the equipment can process fluff, the issue remains whether fluff was intended to be processed exclusively, what product Jazme expected to obtain at the end of the recovery process, and whether the equipment fulfills those expectations. Thus, genuine issues of material fact exist precluding summary judgment on Jazme's claim for breach of express warranty.

### C.     Unjust Enrichment

Jazme's claim for unjust enrichment alleges that Wendt accepted and retained payment for the equipment while failing to provide a system that met promised specifications.  (Am. Compl. ¶¶ 35-38.)  Unjust enrichment applies in actions where there is no legal contract.  *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir. 1947); *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) ("It is a general rule under New York law that no claim for unjust enrichment lies where the subject matter of the claim is covered by a written contract.").   Jazme argues that because an ambiguity exists as to the application of the Contract to Wendt's actions, a claim for unjust enrichment should be allowed to survive as an alternative to the breach of contract claim.  *See Bridgeway Corp v. Citibank, N.A.*, 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001) ("Because there is a dispute as to defendant's obligations under the contract . . . plaintiff's unjust enrichment claim survives, although solely as an alternative to the breach of contract claim.")

However, where the issues involve ambiguities in a contract the parties both acknowledge is otherwise valid, the doctrine of unjust enrichment is inapplicable.  *See IIG Capital LLC v. Archipelago, LLC*, 36 A.D.3d 401, 405 (N.Y. App. Div. 2007) ("[W]here there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies.").   Thus, the Court grants summary judgment to Wendt on Jazme's claim for unjust enrichment.

### D.    Fraudulent Inducement

Wendt argues that the fraudulent inducement claim fails because of explicit disclaimers in the Contract preventing Jazme from relying on statements or representations by Wendt or its employees.  To recover damages for fraud, "the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996); *see also Schumaker v. Mather,* 30 N.E. 755, 756 (N.Y. 1892).

The Amended Complaint alleges that representations by Wendt, including oral and emailed representations regarding the capabilities of the recovery system, fraudulently induced Jazme to purchase the equipment to its detriment.  (*See* Am. Compl. ¶¶ 39-43.)  "[A] general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of fraud." *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (citing *Sabo v. Delman*, 143 N.E.2d 906, 908-09 (N.Y. 1957)). "Thus, even when the contract contains 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made,' a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud." *Id.* (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 598–99 (N.Y. 1959)).  "When, however, the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those

representations." *Id.* (citing *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 976 (N.Y. 1985)).

In *Danann*, the court identified several distinctions between general and specific types of disclaimers, including if the disclaimer is specific to a particular type of representation, and the existence of a clause providing for a "denial of reliance on representations." 157 N.E.2d at 599. The court stated that "such a [specific] disclaimer destroys the allegations . . . that the agreement was executed in reliance upon [the] contrary allegations." *Id.* Similarly, Wendt argues it made no representations regarding the performance or performance capabilities of the equipment not memorialized in the Contract, and that any statements by Wendt's employees or agents cannot be relied on as part of the warranty.

The Amended Complaint states that Jazme believed Wendt's representations regarding the capabilities of the recovery system. However, the Contract explicitly disclaims representations regarding performance. (Myers Decl. Ex. 1, AS001156(I)(g) ("Wendt makes no other representation . . . as to any matter with respect to the equipment or its performance . . . .").) Thus, the Court finds that the disclaimer specifically disclaims the representations Jazme seeks to rely on to support its claim for fraudulent inducement, and grants summary judgment to Wendt on Jazme's claim for fraudulent inducement.

IV.        DAMAGES

Jazme seeks several types of damages, including return of the purchase price, and consequential and incidental damages.  Wendt argues that these damages are unavailable to Jazme because it accepted the Wendt equipment and due to the disclaimers in the contract, thus the Court should grant summary judgment as to the damages claims.

A.        Return of the Purchase Price

When a buyer has accepted goods it is liable for the purchase price, and the measure of damages for any breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have if they had been as warranted.  N.Y. U.C.C. §§ 2-607, 2-714(2).  Section 2-606(1) states that goods are accepted when the buyer: (1) fails to make an effective rejection; or (2) does any act inconsistent with the seller's ownership.  "In a proper case any incidental and consequential damages . . . may also be recovered."  N.Y. U.C.C. § 2-714(3).

The Contract states:

> [T]he Equipment shall be free from defect in material and workmanship . . .
> In the event of the failure of the Equipment to comply with the Warranty
> . . . then Purchaser's sole and exclusive remedy and Wendt Corporation's
> sole obligation shall be that Wendt Corporation shall . . . correct all such
> defects in material and/or workmanship . . . .

(Myers Decl. Ex. 1 at AS001156 ¶ I(a), (b).)

Jazme argues that the system it purchased does not perform as warranted in the Contract or per Wendt's representations, thus it is entitled to recoup the purchase price. It notes that Wendt has not offered any evidence that it attempted to correct the alleged

defects, thus failing the terms of the contract.  *See New York Trans Harbor LLC v. Derecktor Shipyards Conn., LLC*, No. 23423/06, 2007 WL 1532293, at *8 (N.Y. Sup. Ct. May 29, 2007) ("[W]hether circumstances have caused a limited remedy to fail of its essential purpose . . . is a question of fact for the jury and one necessarily to be resolved upon proof of the circumstances occurring after the contract is formed." (omission original) (internal quotation marks omitted)).

Jazme accepted the equipment: there was no rejection and Jazme took actions inconsistent with Wendt's ownership of the equipment, including using it on a daily basis for several years.[3]  However, it is not clear whether Wendt complied with the term of the Contract requiring it to resolve problems related to the equipment.  As a result, Jazme may be entitled to recover the purchase price, as well as damages arising out of the difference between the value of the equipment as warranted by Wendt, and the value of the goods as they were actually received.  *See id*.  Jazme has not yet been required to prove what that difference is, thus the Court will not grant summary judgment to Wendt on Jazme's claims for damages for return of the purchase price.

---

[3] Jazme argues that whether it accepted the goods is a question of fact, thus the Court should not accept Wendt's argument that it accepted the equipment.  However the cases Jazme cites in support of its argument are distinguishable: In *Fil-Coil Co., Inc. v. Int'l Power Sys. Equip. Corp.*, 506 N.Y.S.2d 884, 884 (N.Y. App. Div. 1986), the buyer attempted to return the goods, and in *BT Bldg. Sys. LLC v. N. Hills Holding Co., LLC*, 814 N.Y.S.2d 560, at *4 (N.Y. Sup. Ct. 2006), the failure to satisfy various conditions precedent raised questions about acceptance.  Neither situation is relevant here, where the equipment was paid for, delivered, installed, and is presently in use.

**B.      Disclaimer of Consequential and Incidental Damages**

Wendt argues that consequential and incidental damages were disclaimed by the Contract, which states:

> UNDER NO CIRCUMSTANCES SHALL WENDT CORPORATION HAVE ANY LIABILITY . . . FOR . . . ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, OR ANY OTHER DAMAGES . . . .

(Myers Decl. Ex. 1 at AS001156 ¶ III(a).)  "It is well settled . . . [that when] a contract contains both an exclusive remedy provision and a provision limiting consequential damages, the provision limiting consequential damages will be enforced provided that it is not unconscionable, even where an issue of fact exists concerning the enforceability of the exclusive remedy provision." *Laidlaw Transp., Inc. v. Helena Chem. Co.*, 680 N.Y.S.2d 365, 367 (N.Y. App. Div. 1998).  "[C]ontract[s] in a commercial setting [have] a presumption of conscionability. . . ."  *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 465 N.Y.S.2d 606, 617 (N.Y. App. Div. 1983).   The Court finds that the Contract adequately disclaimed consequential and incidental damages, and nothing has abrogated that disclaimer.

Further, because the Court grants summary judgment to Wendt on Jazme's claims for fraudulent inducement, the contractual limitations of liability are effective here and are not overcome.  *See Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 460 (S.D.N.Y. 1976) ("[C]ontractual limitations of liability cannot be effective if plaintiffs' claims of fraudulent inducement are sustained at trial.").  The disclaimer thus precludes consequential and incidental damages and the Court grants Wendt's motion for summary judgment as to consequential and incidental damages.

## ORDER

Based on the foregoing and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 25] is **GRANTED in part** and **DENIED in part** as follows.

1.    The motion is **GRANTED** as to Claims Three and Four of the Amended Complaint.

2.    The motion is **GRANTED** as to consequential and incidental damages.

3.    The motion is **DENIED** in all other regards.


DATED:  July 18, 2011
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge